Mr. Cook, we will hear from you representing Ms. Tran. May it please the court, counsel. In 2009, Julie Tran was a 56-year-old lady who ran a convenience store near Winchester, Virginia. It wasn't a clean store. She was a hoarder and she was a loner. And you could tell it wasn't the sort of store that most of us in this room would have ever stopped at. Julie had fled Vietnam in the early 1970s. Her parents... I didn't mind if you were a smoker. Well, that's true. She sold quite a few cigarettes. Her parents sent her with her family savings. When she arrived in the United States, she spent little, invested well, and soon earned a small fortune in real estate. This is not pertinent to anything we're going to be deciding today. I mean, it's nice to hear these facts, but... Well, I'm setting it up because one of the defenses in the case was entrapment. Julie purchased her store in the mid-1980s, and her business plan was quite simple. She shopped at other stores, marked things up just a little bit, and put it in her... And the element of entrapment that you're really challenging would be, is it predisposition? That's correct. That's correct. And what this is going to show us is she didn't have any predisposition to do this, or it wasn't sufficient, I mean... That's what we argued to the jury, and that's what we're asking this court to review. That's one of the issues we're asking this court to review. What are those facts that indicate that? Okay. So, for starters, one of the things she sold a lot of was cigarettes. And for years, for a number of years, most of her cigarettes came from Costco. So she went to Costco, got a wholesale price on cigarettes, and marked them up just a little bit, and sold really inexpensive cigarettes, and had lots of people stop them for years. Then, in early 2009, an ATF agent came by. Just as an aside, they had set up a warehouse... The ATF had set up a warehouse and was conducting a several-year sting operation, which they arrested 30-plus different store owners for selling contraband cigarettes. And he approached her. He told her that he was starting a new business. He and his family, they were selling cigarettes at a cigarette warehouse, and would she be interested in cheap cigarettes? And, of course, she said yes. That first conversation was actually very long, and it was one of the only conversations the ATF did not record. And in that conversation, the agent testified, and I believe she testified as well, there was discussion about how the business was run, whether it was legitimate. He assured her that it was legitimate, but he said he tried to appear shady. In the background here are issues of some mental defects. She was found in March 2012 to be incompetent to stand trial. There's some language, some cultural... And there were allegations of malingering. Sure. And in October, I believe, she was sent to Texas. She was treated by the Bureau of Prisons, and by October, she was found to be competent, and there was some thought that she may be malingering. Yes. Okay. Well, it's a sufficiency challenge. It is, and we acknowledge that's a high standard. And so we have to draw all inferences in favor of the government. That's correct. What we have here is that she engaged in the contraband cigarette scheme for over 18 months. She was eager and aggressive in pursuit of that. In fact, she got angry when the agents were unable to provide enough cigarettes for her to resell. She reacted speedily to the overture. She was buying huge quantities, over 150,000, I believe. The store was closed a lot, and it had a chain on the door. There were vans coming up and going from the back door. Given the standard of review, how do you respond to the evidence that we have to accept in the government's face? Yes, ma'am. Most of that evidence is well into this relationship. I think it's important to understand how this relationship started. They started out by selling her lawful cigarettes. They then said, we can sell you a better price, which was very important to her, a better price if you buy in large quantities, if you tell us you have a special customer. She said, okay, I have a special customer, which they were never able to find in the two, three-year investigation. They told her, well, if we can sell them without these stamps on it, then it's cheaper. She said, okay, and she testified, and all indication all along was that she believed those stamps to be marks of quality, not a tax stamp. Now, there was discussions of taxes in early 2009, but that involved, hey, the federal tax is going up April 1st, do you want to order a bunch in March to get the lower price? Of course, she said yes. Although, of course, we have to draw the differences in favor of the government. I understand that. And the government's evidence is that she responded very readily to the suggestion, and was eager to undertake the relationship. She was. So that was at the beginning. That's correct, and she was eager to do that, because she was all about the lowest price. There's cultural issues here, there's language issues here, there's clear, there's no clear understanding that this is illegal. In fact, in January... Well, she had some fairly, she was a fairly sophisticated businesswoman, was she not? Well... She worked in the banking industry. She was a teller in the 70s in Washington, D.C., yes. She amassed a pretty significant amount of money, and she demonstrated some financial sophistication, certainly, did she not? Yes, ma'am. She brought over a thousand pieces of gold from Vietnam, and over the years had used that to buy real estate and other properties, and had rent and so forth. She was worth about five or six million dollars when the ATF showed up. She's also the sort of person that if you saw her on the street, you would think she was homeless. I mean, she's just that sort of a careful person. In January of 2009, Julie asked, there was some, the agent was appearing shady, and she asked the agent, am I going to get in trouble? And he said, if you're in trouble, then I'm in trouble. And I'm not in trouble, so you're not in trouble. And that satisfied her. And in April 23rd, he tried to suggest that this might be illegal. And she said, is this illegal? And his answer was, no, except for the tax stamps. Now, that's a pretty sophisticated English sentence that maybe the folks in this room could gather the meaning of pretty quickly. But we would suggest that because of who she is, who she was, that these issues were not clear to her. Now, there is some evidence that by 2011, she was using the word taxes and stamps interchangeably. But that's why we're focusing on predisposition, which is, of course, where was she before the agents arrived? And by that time, they had gotten her, for lack of a better word, addicted to these prices. Let me understand what you're saying. She has a business. She knows about the basis of running a business. But at least you seem to be indicating that she wouldn't have known that it was illegal to be selling these particular cigarettes, ones that were un-stamped and one that indicated no taxes, knowing that you could get a bigger value than others. You're saying she wouldn't know that? Well, there's nothing in the evidence on which we can infer that she would know this? Well, I'm saying that she did not know that there's a stamp on the bottom of the cigarettes that indicates that a tax has been paid. That was a detail that had never been explained to her, and she did not know. She's in business. And in a number of things, if you're in business, you may not know it, but you could be illegal if you're doing it. I mean, you may not have known that you maybe couldn't sell alcohol in a certain way to minors. And the minor comes in and buys. She says, well, I just didn't know it. And you send a minor to buy it. That's not going to get off the hook. I mean, a certain thing's a business person. Now, it seems, though, there's some overture in this record. This lady was really a malignant. I mean, and there's some evidence to that extent. You have to admit, I mean, she's not as unsophisticated as she comes across in that Miranda type hearing. She knows a lot of things, and she seems to know what she wants to know and not know what she doesn't want to know. Well, the government certainly wants you to believe that. I'm only going on what the record is indicating here in terms of her statements that I hear. Some are pretty sophisticated, as Judge Duncan has indicated. And some are like, oh, I'm just a foreigner, and I don't understand the English language and what is illegal and that sort of thing. And yet, at the same time, she's making hundreds of thousands of dollars, selling thousands of cottons of cigarettes. And if I may just add one, my favorite, what is silence? Well, I've spent several years with her, Judge. And I mean, I guess I can't testify. But that's, yeah, it's a really sad, really sad situation. Well, I think you're right that evidence of her knowledge or lack thereof of whether the stamps meant something with respect to the sale is relevant to the issue of entrapment. But as Judge Wynn pointed out, this is a woman who was in this business. So I think, I guess the point is that the court and or the jury were entitled to discount her professed lack of knowledge. That's what happened, right? Yes, sir. So how do you overcome it? Well, I'm asking this court to look at the record and to see and to look particularly predisposition. There's a lot, there was days and days of evidence of 2010 and 2011. And I think that 2009, in particular, those beginning dates could have really been obscured by that evidence. And I'm asking the court to look at it. I'd like to move on to the other point, which I, quite frankly, is the stronger point. And that has to do with the Miranda non-waiver. The court, I believe, has the audio recording. And I hope the court has listened to particularly the first 20 minutes or so of that recording. She had just been, her home had just been raided. She'd been taken to a police station or some sort of office to be interviewed. The agents, as they always do, get some identifying information and then they start going through Miranda. They do try their best to explain Miranda to her. I'm not saying the agents tried to steamroll through it or so forth, but you can just hear the frustration in their voice because she does not understand what it is that they're talking about. Okay. But she doesn't say, I don't understand. She says, you know... She says, what is silence? Right. Right. So he says, you have the right... See, it's one thing to be able to sell something or to ask where the restroom is, but these invoking rights and silence and waiver are much more complex and it's a different beast than saying, I want three cartons of cigarettes. Okay, that'll be $20. But there's also a transcript of her conversation with an undercover officer in which she's explaining how to launder money. Well, how to make a structured deposit, yes. This, you've got to understand, this is a very traumatic experience when she was arrested. When she was taken in, she was in some sort of shock. And I think that that's clear. And as the conversation gets going, she tells stories and as she's asked questions about what happened, she can talk well. But on these issues of you have the right to remain silent, do you understand that? What's silent? Or, I mean, just read through it. What kind of education did she have? She was, I believe the evidence was she was educated in Vietnam. There was a certificate that the government had, I think it was a photocopy of a paper that appeared to say she was... It was actually a diploma. A diploma that was found out later to be invalid. But notwithstanding that, she did have some, I guess, equivalent to college-level courses through her employment as a banking industry. Yeah, apparently she had a class or two at the bank that was helping her with that. That was in the 1970s. She'd been in this country for 40 years. Yes. She never needed an interpreter or translator at the trial. That's correct. So it's not like she didn't understand the English language. And I get your point. She gets around. She gets around and she understands enough. But in this situation, she's with... For 40 years. Well, and I also say she's kind of a loner. She lived in this house, in this store, and people came and went and bought stuff from her, but she had no friends. I'm trying to understand exactly where you're going with this because I have to put it in context of so many other cases we get dealing with Miranda-type issues. People who are all that sophisticated and who are not as educated. Some people who really, really do have a difficult time understanding and sometimes they acquiesce. Of course, in this country, you have major questions in terms of confessions sometimes that are made that are really not valid. Nonetheless, they're made. This just does not appear to be that type of case from your client's perspective. I know you're doing the job of arguing the issue, of course, but I'm sort of not grasping what it is she's not understanding when she can do all these other things. I mean, and she's making a lot of money in this country and that takes some level of sophistication to do it in the business world. This is a woman who shortly after this was found to be incompetent, Sandra. Okay, so there's other things going on. Well, the government's doctor, yes, suggested that that could be what's going on. But she was found to be incompetent in trial in March and my time's up, I guess. Why don't you finish your sentence and you do have some time left. I'll catch my breath here and be back in two minutes. Thank you very much. Mr. Terrion. Good morning, Jeb Terrion, appearing on behalf of the United States. Based upon the very pointed questions this court has already posed, I will just kind of focus in on the facts and points that the government believes supports its argument. First, let me start with the entrapment issue. First and foremost, obviously, the government really doesn't believe it is a significant issue. In fact, the government argued before the trial court that the instruction regarding entrapment should have never been given. The law is quite clear. The instruction should only be given if there's evidence sufficient to find government inducement. Yet even the district court makes a comment, I believe, at Supplemental Joint Appendix 1264. It was given and there was no entrapment found on it. The only issue that seems to be focused on is predisposition. And the opposing counsel indicates that the evidence is sufficient as a matter of law to establish that. And the court has already ticked off a list of evidence that you put forth that seems to indicate that it would be there. I don't know what we add to that, but why don't you comment on that? Your Honor, one of the more interesting pieces of evidence that really came from the defense was the defendant's accountant. Their experts, even on cross-examination, conceded that the records for Ms. Tran that predated her involvement with buying untaxed cigarettes from the government showed massive purchases of cigarettes from Costco. And even in his own words, cigarettes and a plum. That was it. Yet it's a tiny store that the agent missed multiple times driving down the road. He didn't even realize it was a store. It's so run down, so dilapidated. And even the district court called it a front. So the government's investigation indicated she'd been doing this. She'd been engaging in trafficking in cigarettes that had stamps on them. She simply switched the cigarettes with stamps on them to cigarettes with stamps not on them. I have a question that kind of lingers a little bit. That is, the opposing counsel indicated that there's a lot of this that came after the investigation takes on. Does it matter of evidence of predisposition? Must it be evidence that's presented that shows things that happened before that would show the predisposition? Or could it be evidence after the operation starts? No, Your Honor. The evidence can come both before and after the investigation starts. And I think that's consistent with trying to understand the person, their personality, what their predisposition is. And so you look at all of the information available. And in this case, I mean, the court has already ticked off fact after fact after fact to suggest that she readily and steadily accepted the opportunity to make more money as a criminal. Indicate she was predisposed. District Court seemed concerned about this colloquy between the agent and Ms. Tran where she asked, are we going to get in trouble or are we going to be in trouble for this? The response being, if you're in trouble, then I'm in trouble, suggesting that there really wasn't anything to worry about. What do you say about that? Yes, sir. The court faced with the legal requirement that it must find some government overreach, even though it ultimately found that there wasn't, focused on this one statement. And the court kept saying it was concerned about this statement. You know, am I in trouble? Are you in trouble? The context and the timing of that statement is critical because that conversation takes place prior to Ms. Tran purchasing untaxed cigarettes. In the context of that conversation, if you read the whole transcript and you don't just focus on that one statement, it appears to be, and the government's suggestion is, it's a conversation about Philip Morris. And you can see this from the conversations that take place a day or two thereafter. There's additional conversation about Philip Morris. In fact, when the agent shows up, I believe a day or two later, she tells him to leave because the Philip Morris representative is in the area. And she doesn't want the representative to see her interacting with the undercover agent. So it's the government's position that first and foremost, that conversation is about Philip Morris and its allotment of cigarettes for their buyback program. And I don't want to get into any of those details. It's rather complicated. But I think it is important to understand that even if there was a misunderstanding between the two parties, and Ms. Tran was really thinking to herself, okay, I'm engaging in this criminal conduct and I'm selling my taxed cigarettes to traffickers that are going north, if that's her thinking, and the agent is saying, well, we're not in trouble, then that by definition is evidence of her predisposition. Because she can't understand that statement to mean, okay, well, what I'm doing is legal unless she's been doing this activity of sending the cigarettes north, which has been evidence of predisposition. The record is somewhat... The record contains inconsistencies because she was told apparently at one point, you know, you're not allowed to sell cigarettes without having stamps on the line. Yes, ma'am. I believe that comes in April of 2009. So just a few months into the investigation, there's some very clear conversations about it. And if you look at her surrounding conduct, the way she structured her money, the way she moved money between accounts, you know, her tax returns all indicate someone that knows what they're doing is wrong and they're trying to hide it. I mean, just by looking at her tax return, you can see the millions of dollars she's making isn't reported. So she is attempting to try and hide her activities, certainly the benefits of that activity. I'll go ahead and move on to the Miranda issue. I think it's important to highlight, again, the facts of this case. She was diagnosed as a malingerer. It was found that she thoroughly understood the English language. There was no need for an interpreter. She testified at trial. She gave her version of events, which was clearly rejected. What's the significance of the diagnosis of a malingerer? I'm probably not as attracted to that as the other pieces. And the reason is, I'm just wondering, to what extent do we get an expert opinion on this? I mean, the court is the fact finder of this. And you bring one, say she's a, it's one of the psychiatrists that say she's a malingerer. Wouldn't you have to say that at the time that this occurred, he could state to a reasonable degree of some kind of certainty that she was malingering? But a malingerer could be one who's that one time or the other. I'm just pointing out to say, I think the, I don't want to overplay the use of that diagnosis because in, I'm not sure it's fair in this case. And I don't think you need it. Well, let me. In order to be able to establish that, at least from a perspective of our review. I highlight that point only because I believe it is consistent with her activity when she's initially interviewed, post-arrest. She is someone that wants to have selective knowledge, which would seem to be consistent. So like an antithought, after you've established it, this is something that helps you. Well, yes. This even shows this is. To me, it's all consistent of the same personality. When she takes the stand at trial and testifies, she has this selective knowledge. When she's interviewed post-arrest, again, she has this selective knowledge, this selective understanding. It's consistent with the medical report that even if you set aside the diagnosis, just the facts within it, she seems to know something on one day, but then she knows it in the afternoon. So just the malingering activity is consistent with her selective understanding at a post-arrest interview and her selective understanding when she testifies at trial. That's the only point I was really trying to make by bringing up that medical report. But we do have someone that has this pattern of selective understanding, who is sophisticated. She's taken college courses. She had a diploma that we found during the course of the search warrant. You say selective understanding. That's all well and good. I suppose the record supports that. But doesn't a defendant have a right to be selective about his or her understanding with respect to Miranda rights? She says what is silent, whether you believe that or not. I don't think the officers are compelled to insist upon an interview at that point or to ask questions, are they? Well, but the ultimate question I think that this court has to decide is, did she know she had a right to remain silent? That's the question. The test is looking at the totality of the circumstances, how do we draw a conclusion? The fact that she said, I don't understand, or what does silence mean, is one fact among many. And it's the government's position that all of those other facts suggest that we have a sophisticated businesswoman who's well-educated, she understands. And in fact, I think there's a part of the interview, and this is in the joint appendix, it's 74. She knows she has a choice. She can remain silent or not. The fact that she knows she has a choice to speak or not to speak clearly indicates she understands. She knows she can be quiet. And she's asking the officer, so I can be quiet? He says, yes. And then thereafter, she even asked the officer, what should I do? So again, she understands, she appreciates that she has a choice to make. And by knowing she has a choice to make, she knows what that option is, and that's to be silent. So she knows she has that option. She knows she has that right. And that's just indicative of the fact that she's asking the agent, which choice should I make? So I think the record supports the conclusion that she did know. And then certainly all the surrounding circumstances bolster that statement. And without that statement, the trial would be, the evidence would be insufficient. I'm sorry, Your Honor. Without the statement that was provided, the evidence, her first statement that was made, that she can put in wrong. If we were to say it should have been suppressed, would the evidence be insufficient? No, Your Honor. I would classify the evidence that came in regarding this 18-month undercover investigation as entirely overwhelming. It is, I believe, we introduced approximately 500 exhibits, many, many transcripts of her interaction with the officers. I guess the court is anticipating a harmless error argument. The evidence... I wasn't anticipating it. I was just asking, you know, if he's arguing, I'm just wondering, this always comes up, you know, if someone's arguing it ought to be suppressed. Usually it's dealing with something, maybe like drugs or something like that. You don't have that in evidence, then you just don't have a trial. There's a reason they're arguing for it. But if the evidence is overwhelmingly going in a way to argue for that, you might win that battle. But you're not going to win the war, as you've indicated, maybe harmless. So what if the statement was in? Your Honor, whether this statement was in or not, I don't think it would have mattered one bit. In fact, I think her testimony at trial was a thousand times more beneficial to the government than the statement she made post arrest. I mean, it thoroughly and firmly undermined her credibility before the jury. I mean, it was so outrageous, as you've kind of indicated, this selective knowledge again comes up, and it was just not credible. Thank you. Of course, the conclusions of selective understanding, and she's sophisticated, are conclusions, and they're not, they can be drawn, and the government certainly wants you to draw those, but they can also, some of what happened might not have been selective understanding, might have been mental illness, and that sort of thing. And if you read her, I encourage you to read her testimony, because it's a little crazy. And I'm sure the government wants you to read it as evasive, but it's indicative, I think, of some other issues that are going on. I want to focus on the Miranda briefly, because I think it's really important. We could read through 14 pages, I'm not going to do that. What's important is the last piece, because they've been going back and forth. I don't understand Simon. What don't you understand? I've explained it to you. Back and forth, back and forth. And finally, at the end, she's asking the question, why am I here? They've come into her house, they've taken her. She doesn't know why she's been arrested. Nobody's told her, they haven't given her a warrant, or anything like that. And the discussion comes down to, can I explain why you're here? Can I explain why you're here, what these charges are about? Can I? You tell me. Yeah, can I tell you? Yeah. All right, so we can talk now. Can we talk? You tell. You please. Okay. And this is at page 79. Okay, we're going to talk. This is implied consent. If you're willing to talk to me and engage in conversation, that is talking. But the officer finally got, the conversation went from a discussion of invocation of Miranda to a conversation about the facts of the case, with a promise that, look, if you say we can talk, then I'll tell you what's happening. I'll tell you what this is about. And that's the conversation, I encourage you to look at page 79. That's the conversation that ultimately gets her from this issue of, explain my rights, to, okay, let's talk. But she didn't actually say it. What more would the officers have done? What's that? What more would the officers have done? They're trying to go through her rights, to tell her her rights. They're being, apparently, at least from the face of the record, it does look like they're rather patient about it. They're not being flippant with her. That's right. She says, I don't understand, silent, and maybe she didn't. They try and work with her through this. I mean, much more. I mean, typically, to read Miranda rights, you read them and you understand his rights, and you say, yeah, she probably got a problem there. You don't go into all this other stuff. But they went line by line on this thing and dealt with it. And what more could these officers have done? That's not really the issue. I mean, the judge focused on that. The district court judge talked about how he reviewed the record. There was no coercion, intimidation, or deception. And there wasn't. But that's not the issue. The issue is, before somebody can waive or impliedly waive their rights, they've got to understand it. Well, I thought the indication of the right to remain silent had to be clear and unequivocal. To invoke it. Right. But to waive it. They're saying, they're not saying she, it's not the defense here saying we invoked our right. It's the government here saying she knowingly and voluntarily, I'm sorry, knowingly and intelligently waived her right. And you can't waive something if you don't understand it. And I should also say that- What was inaccurate about the fact that the officers would explain the charges to her if she wanted to talk? That wasn't inaccurate. But it's kind of, it's not inaccurate. Yeah, they can explain what they want to her. But the question is here, can her statement be used against her? She's in custody. She's being asked questions. Can they use her statement against her? If she knowingly and intelligently waives her rights under Miranda, the answer is yes. But she didn't get it. It's clear she didn't get it. What could the officers have done? Discontinued the interview. You know, tried to get her in a different environment. Talked to her a few weeks later after the shock wore off of the arrest. Try to see if they need an interpreter. There's a lot of things they could have done in order to preserve the statement. But they didn't. They just kind of said, okay, never mind. You've waived it. We're moving on. And I'm not faulting them for failing to explain it. What I'm saying is the government can't use it because the waiver wasn't knowing and intelligent. Also, another point is we've been talking about silent. But Miranda is not just about that first warning. There's not just silence. It can be used against you. You have the right to an attorney. If you can't afford one when we provide it to you. Those also have to be understood. And there's no indication anywhere that that was really understood as well. So for all these reasons, we would ask you. Did you say you've been representing her for a long time? I was appointed in November of 2011, yes. Oh, okay. I thought you said previously then. No, no, no. I was appointed as a CJA attorney. I understand. Thank you. Thank you. Thank you very much. And Mr. Cook, the court notes that you are court appointed. And we would like to express our gratitude to you for your representation in this case and your service to the court. Thank you. We will come down in group counsel and proceed directly to the last case. Thank you.
judges: Allyson K. Duncan, James A. Wynn, Jr., Albert Diaz